409 P.2d 968

**STATE of Utah, Plaintiff and Respondent,**

v.

**Lewis Elmer FRAYER, Defendant and Appellant.**

**No. 10175.**

Supreme Court of Utah.

Jan. 24, 1966.

Jimi Mitsunaga, Public Defender, Third District, State of Utah, Salt Lake City, for appellant.

Phil L. Hansen, Atty. Gen., Ronald N. Boyce, Asst. Atty. Gen., State of Utah, for respondent.

HENRIOD, Chief Justice:

Appeal from a second degree murder conviction. Affirmed.

Defendant, 18, who used the alias of W. C. Lynn, after he induced his girl friend to procure a certified copy of her brother's birth certificate, admittedly for the purpose of being used by him unlawfully to identify himself as being over 21 in order to frequent taverns, was charged with first degree murder in the shooting of one Garcia, in a rather bizarre case.

There is substantial, competent evidence in the record which, if believed by the jury, would require us to sustain any

verdict of guilt they may have returned on the first degree charge or any charge therein included with the logical conclusion that if the veniremen had acquitted the defendant, they would have believed little or none of the pertinent evidence adduced, relegating the homicide to accident or unavoidable incident. This latter they did not conclude.

Adjunctive to the conclusion of the paragraph next above, a fair abstract of the facts reflected in the record more favorable to support the verdict, to which facts we must look on familiar appellate principles are the following:

On July 7, a university student, E, met the accused at a nightclub in Salt Lake City, and the latter requested that the former drive him elsewhere to a tavern, and the request was granted. En route, Frayer sought a match, was told by E there was one in the glove compartment, which Frayer opened and which revealed a pistol. Frayer suggested that they go to a dance at Evanston, Wyoming and it was so agreed, and they proceeded thereto after buying beer at a tavern. At this juncture Frayer appropriated E's ignition keys. On the way to Evanston they stopped at an inn and service station for gas. Waitresses in the inn said the gas pumps were closed, whereupon Frayer suggested he might shoot the locks off. They proceeded on toward Evanston, when defendant asked E to pull to the side of the road, which E did, whereupon Frayer proposed an act of homosexuality which was refused. Arriving at Evanston, they could find no dance. They then unsuccessfully sought out a brothel. They started back to Salt Lake, stopped at a cafe where the accused bought a package of firecrackers and stole three. They stopped at the side of the road again and Frayer fired some shots into the mountain and into the ground near E, then pointed the gun at E and pulled the trigger. They proceeded on toward Salt Lake and E asked defendant to put the gun back in the glove box. Defendant opened the box and found a box of shells which he appropriated. Nearing Salt Lake, the accused had E stop for a parked car in which there was a middle-aged woman asleep, who, the accused said, probably was his aunt, which was not so. Later another car parked on the shoulder was observed, which Frayer said was his uncle's. They stopped. E let the defendant out, the latter still possessing the gun, glad to get rid of him.

In the car were a divorcee and two itinerant musicians, one of whom died later from a gunshot wound. The other said the first time he saw defendant was when the latter already was in the car, with a pistol in his hand. Frayer indicated he wanted a ride to Salt Lake and one of the occupants, not the deceased, was fixing the back seat to accommodate defendant when the former, claiming defendant was taking indecent liberties with the divorcee, who

was crying out, defendant trying to get on top of her, so he hit the accused with a stick and told him to get going. Nonetheless a fight with sticks was in the offing and Frayer said he wanted his gun back. In the meantime the divorcee shook Garcia, the driver, but could not awaken him. The accused retrieved the gun, a slug from which had hit Garcia in the head, from which he died, apparently no one having heard the shot. Accused admitted shooting Garcia, claiming it was accidental, while he was trying to rifle the car for "pills." He said all he wanted was a ride to Salt Lake. This request was granted after it was observed that Garcia was bleeding from the nose. The car was driven to the closest Salt Lake hospital, and Garcia was administered to without success. Defendant disappeared but upon apprehension later, said he threw the gun, which was never found, into a river, and went home.

E read about the killing the next day and told police what had happened so far as he was concerned. On July 9, with the cooperation of E, deputy sheriffs approached the accused in a local tavern late at night, and he identified himself as Lynn, his alias. He was taken to the local police station, and in a lineup was identified by the divorcee and the itinerant musician who had hit him with a stick. He was taken to the next county where he was questioned, giving several false alibis, after being advised in every respect as to his rights to speak or remain silent, and as to his right to counsel.

Defendant now urges that 1) he was held and interrogated under compulsion and in violation of his constitutional rights; 2) that there was error in allowing cross-examination as to bad character based on accused's prior juvenile record; and 3) in instructing the jury as to second degree murder.

As to 1): Without detailing all of defendant's claims of unwarranted violation of his constitutional rights ranging from trickery to coercion in obtaining his signed statement, we are convinced that such claims are figments of someone's imagination, since the record reveals that this man was afforded every opportunity possible to remain silent and to consult counsel at all times,—which disposes of 1).

As to 2): The point on appeal that a) there was error in allowing the prosecution to cross-examine the defendant who took the stand, as to his prior juvenile record, and b) that statutorily you can't use one's juvenile *court* record to stultify the accused.

As to a): There is no merit to his contention, since defendant's own coun-

sel opened the impeachment door by questioning defendant, who took the stand, on a question and answer basis that obviously was designed to paint a portrait of a Blue Boy, honorable and unfettered by anything but divinity, whose portrait was blurred by a broken home. To get by with such approach and then claim "foul" when questioned as to his haloed history would be jurisprudentially naive and most unfair in the judicial administration of criminal justice.[1] As to b) : No one tried to use any *court* records to show anything; so that this contention does not impress. If a youth says he did not steal an apple, and someone wishes to refute it, this may be done irrespective of whether there is any record of conviction or acquittal, regarding the attempt to keep down doctor's bills by stealing the forbidden fruit.

As to 3) : The theme is that if counsel for defense wants an instruction on first degree murder, or nothing, taking a chance on the outcome, his position may have merit if the evidence shows that there could be no offense in between. But under the facts recited above, the jury could have found defendant guilty of any of the offenses which the trial court instructed were included. This is not like the case where one buys a gun, loads it, and with proven malice aforethought walks up to his enemy and shoots him through the heart in cold blood. This case is not one where the defendant was John Wilkes Booth. The point on appeal is not well taken.

McDONOUGH, WADE and CALLISTER, JJ., concur.

CROCKETT, J., concurs in the result.

1. Wigmore, Evidence (3d ed.) § 58.